[No. 28440. *En Banc.* February 6, 1942.]

*In the Matter of the Guardianship of* ETHEL NELSON, *a Mentally Incompetent Person.*

ETHEL NELSON, *Appellant,* v. J. FRANK REDFIELD, *as Guardian, Respondent.*[1]

[1]Reported in 121 P. (2d) 968.

*Ray M. Wardall* and *Fred C. Campbell,* for appellant.
*Wright & Wright,* for respondent.

BEALS, J.—Ethel Redfield and Peter Nelson were married in 1907, and resided together in the city of Anacortes until Mr. Nelson's death in 1936. Mrs. Nelson has been afflicted with diabetes for over fifteen years, and for a long time has been required to take insulin to control the disease. She owns property, both real and personal, of approximately twenty-five thousand dollars in value. Mrs. Nelson is a college graduate, and for many years taught school in Anacortes.

Mrs. Nelson has two brothers, Oren and J. Frank Redfield, and two sisters, Irma Hall and Arlie R. Mowry. During the winter of 1939, Mrs. Nelson was residing in Los Angeles, California, and, on March 28th of that year, her brother J. Frank Redfield, a resident of the city of Seattle, filed in the superior court for Skagit county his petition alleging that his sister Ethel Nelson was mentally incompetent, that she was a resident of the state of California, and asking that he be appointed as guardian of her estate. The court fixed April 13, 1939, as the date for the hearing on the petition. No notice of this hearing was at any time served upon Mrs. Nelson.

Early in April, Mr. Redfield and his wife went to California, and suggested to Mrs. Nelson that she return to the state of Washington in their company, to

which she assented. The three persons then traveled by stage from Los Angeles to Seattle, going to Mr. Redfield's home, where Mrs. Nelson stayed for several days. Mr. Redfield said nothing to his sister concerning his application for appointment as her guardian, and on April 13th went to Mount Vernon, leaving her in Seattle, and testified in support of his petition. After the hearing, the court entered an order appointing Mr. Redfield guardian of his sister's estate. No guardian of her person has ever been appointed.

Mrs. Nelson was not present or represented at the hearing on her brother's petition, and knew nothing of the proceedings which led up to the appointment of her brother as guardian of her estate until after his appointment. It appears that for many years Mr. Redfield has been indebted to his sister in a considerable sum, for money borrowed by him from her and Mr. Nelson. Shortly after Mrs. Nelson learned of her brother's appointment as guardian of her estate, she retained counsel, who, on her behalf, appeared specially in the probate proceeding, and moved to quash the order appointing Mr. Redfield as guardian. This motion having been denied, Mrs. Nelson applied to this court for a writ of certiorari, in an attempt to bring the ruling of the trial court before this court for review. Her application for a writ of certiorari was denied. Later, Mrs. Nelson retained counsel, and filed in the guardianship proceeding her petition asking that she be declared competent to handle her own affairs, and that the guardianship be terminated, or in the alternative, that her brother be removed as guardian of her estate and some other suitable person or corporation be appointed to act as guardian of her estate. *In re Michelson,* 8 Wn. (2d) 327, 111 P. (2d) 1011.

The guardian filed his answer to Mrs. Nelson's peti-

tion for his removal, and in due time the matter came on regularly for hearing. February 17, 1941, the trial court entered an order denying Mrs. Nelson's petition, from which order she has appealed.

Error is assigned upon the ruling of the court that appellant is incompetent to manage her estate; upon the refusal of the trial court to declare appellant competent; and upon the entry of the order dismissing appellant's petition. Error is also assigned upon the trial court's refusal to remove Mr. Redfield as appellant's guardian, and to appoint some other person in his place. Appellant also complains of the court's refusal to allow, out of appellant's estate, compensation for her attorney's fees and costs. Finally, appellant contends that the trial court erred in basing its decision in part upon two letters written to the court by appellant, one letter bearing date April 30, 1939, the other May 5th following.

The trial court filed a comprehensive memorandum opinion, and, in the order dismissing appellant's petition now before us for review, adopted the memorandum opinion as findings of fact and conclusions of law.

At the time of the hearing, appellant was fifty-nine years old, and had been suffering from diabetes for over fifteen years. To counteract the disease, she took insulin, and on several occasions suffered from "insulin shock" of varying degrees of severity, the disease, of course, tending to render her physically weak and extremely nervous. It appears probable that appellant suffers to some extent from cerebro arteriosclerosis. For approximately a year and a half prior to the hearing, Mrs. Nelson had been an inmate of a rest home in the city of Seattle, conducted by Francella Schultz, who, while not a registered nurse, has had considerable experience in the care of the sick and afflicted. It appears that, since she has been an inmate of this home,

Mrs. Nelson has received excellent care, and that she is happy and contented.

Due to the weakening effect of the disease, the insulin treatments, and resulting sclerosis, coupled with advancing years, Mrs. Nelson's physical condition has grown worse. Her memory has also suffered some impairment, and her mental processes have, at times, appeared somewhat sluggish. Of course, while suffering from insulin shock the victim is not mentally normal, any more than one is mentally normal while intoxicated or under the influence of narcotics. It is evident that Mrs. Nelson, before the ravages of disease had affected her, was an unusually bright and intellectual woman, of keen mentality.

The order appointing Mr. Redfield as guardian referred to appellant as mentally incompetent, and appointed Mr. Redfield guardian of appellant's estate, not of her person. The order now before us for review simply recites that appellant is still incompetent, and denies appellant's petition to be declared competent and for an order closing the guardianship.

Bearing always in mind that no guardian for appellant's person has ever been appointed, or any occasion therefor suggested, we proceed to consideration of the evidence as presented by the statement of facts. This evidence was very largely made up of the testimony of witnesses who stated their opinions of appellant's mental condition, several physicians having testified, some of whom were experts in mental diseases and psychiatry and some general practitioners. Several lay witnesses stated their opinions as to appellant's mental condition, past and present.

Appellant testified as a witness on her own behalf, and her testimony, as contained in the statement of facts, reads very well indeed, containing very slight, if any, suggestion of mental deficiency. It does, how-

ever, clearly appear from the record that appellant was weak physically, became much fatigued during the course of her examination, and was often slow in answering questions propounded to her.

In response to a question by her counsel, "Do you think that you are capable of handling your own business affairs at this time?" appellant answered:

"Oh, I don't think so, no. But I think that with Edwin Barker looking after the collections of my real estate that things would work out all right."

Later, on redirect examination, appellant, when asked to explain her statement above quoted, said:

"When I made that statment I meant that I did not feel that I could go back and forth from Seattle to Anacortes and collect the rents; that I needed an agent to do that, and I have always had one. Edwin Barker has usually done that."

In the memorandum opinion, the trial court observed that, after each question was propounded to appellant, a long period of time would elapse before she would answer, and that she appeared to have great difficulty in remembering facts and in collecting her thoughts. The trial court also called attention to the fact that while testifying appellant looked at Mrs. Schultz, with whom she was living, as above set forth, and that Mrs. Schultz indicated an affirmative or negative answer by nodding or shaking her head. The opinion states that the trial court was unable to determine the extent of the effect of Mrs. Schultz's conduct upon appellant. Examination of appellant's testimony indicates that affirmative or negative signs would have been of comparatively little use to the witness, assuming that she understood and observed them, as comparatively few of her answers included a mere affirmative or a negative. It would seem that, if the trial court had observed Mrs. Schultz signaling to the

witness, either Mrs. Schultz should have been admonished to refrain from such conduct or directed to withdraw from the court room. It does not appear, however, that any steps were taken by anyone to check the extremely improper conduct to which the trial court later called attention.

Assuming that Mrs. Nelson did require an unusual length of time to answer questions, her answers were intelligent and, while at times suggesting that her memory was not equal to the average for a person of her mentality and age, neither indicated nor even suggested any other mental disability.

The record contains many letters written by appellant during the year 1939 to her sister. These letters indicate no mental weakness or deficiency whatsoever. Quite the contrary is true. The trial court observed, concerning appellant, that she "presented the appearance of one who has almost reached the condition of total physical collapse," but he further remarked that "Mrs. Nelson's answers to questions propounded to her were responsive and logical. This also appears from her letters."

Dr. D. A. Nicholson, who for many years has practiced in Seattle as a specialist in mental diseases, and who examined appellant August 23, 1939, and July 1, 1940, for the purpose of forming an opinion as to her mental condition, was called as a witness by appellant. He testified that appellant "was still mentally competent to consult with her attorney or agent as to what she desired to do with her property, but not physically well enough to take care of the property herself," the doctor referring to his opinion after his last visit with appellant. The witness also stated that in his opinion it might be advantageous for appellant to have some trust company look after her business affairs, but this opinion evidently referred to the choice of a reliable

agent by appellant to represent her, rather than the appointment by the court of a guardian for her estate, based upon any supposed mental incompetency of appellant.

The witness also testified that appellant was suffering from a speech defect due to a partial paralysis of some throat muscles, which rendered it impossible for appellant to speak distinctly or in a loud tone. This condition would, of course, tend to cause appellant to answer questions more slowly than would one not suffering under such a difficulty, and would also render a lengthy examination in court very fatiguing, and would result in making appellant nervous.

Dr. E. C. Ruge examined appellant twice during the month of June, 1940, for the purpose of forming an opinion as to her mental competency. This witness, who also has had long experience in the study and treatment of mental diseases, testified: "I felt after my examination that she was competent mentally to handle her own business affairs." Later, the doctor testified that, from his observation of appellant while in the court room, and while she was testifying, it was still his opinion that she was mentally competent.

Mr. E. M. Barker, who formerly represented appellant as her business agent, testified that he had talked with appellant four or five times since the appointment of her brother as guardian of her estate, twice within the last three weeks before the trial, and that in his opinion appellant "has mental competency to handle her own affairs."

Mr. W. V. Wells, a lawyer who had been an intimate friend of appellant and her husband before the latter's death, and Messrs. C. L. Miles and Harry Matthews, fellow residents in the rest home where appellant was staying, testified that appellant was possessed of a good, if not a brilliant, mind, and was perfectly competent

to handle her own business affairs. Mrs. F. Schultz, who conducted the rest home, and appellant's sister Mrs. Arlie R. Mowry, testified to the same effect, but their evidence is subject to the criticism that they might well be interested in the result of the trial.

Respondent, in an endeavor to prove that appellant was incompetent, called five witnesses. Dr. J. L. Hutchinson testified that, during the month of June, 1940, he was called to treat appellant, who had fallen and hurt her head. The witness stated that he had talked with appellant in order to get a history of her case, and from appellant's statements and the doctor's examination, he formed the opinion that appellant was suffering from "an arterio-sclerosis, with perhaps a sclerotic condition of the vessels of the brain, and a diabetic condition." In response to a question from respondent's counsel, "Under those facts did you conclude she was mentally competent to handle her own affairs?" the witness answered: "I haven't gone far enough to be sure about the mental part of it; but I knew she was not physically able."

Dr. S. G. Brooks, of Anacortes, testified that he had known appellant for twenty-eight years, and had treated her prior to 1936, though not subsequent to that year. The witness testified that he saw appellant on one occasion a few days prior to the hearing, and he had a talk with her, which he referred to as "just a casual conversation." Respondent's counsel stated that he desired to show by the witness that appellant "was mentally irresponsible three years ago and connect it up." The trial court overruled an objection by appellant's counsel, whereupon the following occurred:

"Q. The question was, did you arrive at an opinion as to whether or not Mrs. Nelson was competent to manage her affairs—physically and mentally competent? A. Yes, I did. Q. Was she, or was she not? A. At times not. Q. What was that due to? Explain

it to the court.  A. I think mostly it was due to the fact of her taking insulin.  She took insulin and has for years, and if you take too much insulin and do not get enough sugar to burn it up you get a condition of hyper-glycemia and you are, at least temporarily, mentally incompetent.  Q. When people are in that condition, as a result of that are they easily imposed on—overcome in business affairs, or not?  MR. CAMP-BELL:  We object as leading.  Let the witness testify as to her condition.  THE COURT:  Objection overruled.  A. What is the question?  (Question read.)  A. I could imagine cases where they could be, yes.  Q. Are they able to evaluate property of their estate, or money?  A. That is a hard question to answer, because the degree of incompetency is a good deal of the degree of the stage of the insulin shock.  After they have had a spell of being unconscious for maybe two or three hours, and possibly have a convulsion, and so on, it leaves them as a physical wreck for several days and during that period there are various degrees of incompetency.  Q. It also leaves them in bad physical condition I assume?  A. Eventually, yes."

On cross-examination, the witness again stated that he had not seen appellant professionally for over three years, and that he had stated to appellant's counsel: "I said I did not see how I could testify either way, for the reason that I had not seen her professionally for over three years."  The witness further testified that he did not pretend to know what her condition was at the time of trial, and that from his recent observation of appellant, he would judge that, while she was physically weaker, as to her mental condition,

"  .   .   . it seems to me that if there is any change in her at all she is a little more competent, if anything, now than she was then.  At times (I do not say it is this way all the time), but after these spells for several days she was not herself at various times.  When I talked to her the other day she talked rationally enough."

The testimony of the two witnesses last referred to has little bearing upon appellant's mental competency at the time of the hearing. Certainly their testimony does not support respondent's contention that any necessity exists for the appointment of a guardian for appellant's estate.

Dr. E. D. Hoedemaker, who practices in Seattle, and whose specialty is the diagnosis and treatment of nervous and mental diseases, testified as an expert on behalf of respondent, stating that he had examined appellant on one occasion, and on another occasion had called on her, but was not permitted to make an examination. The witness testified that he first saw appellant April 17, 1939, at the request of her physician, who was treating appellant at a hospital, stating that he spent about three-quarters of an hour with her, in an attempt to determine her competency. Appellant told the witness something of her early history, that she had diabetes, and was required to take insulin, and that at times it was difficult for her to concentrate. The witness stated that appellant wandered somewhat in describing her properties, and became confused if the witness spoke rapidly in asking her questions. The witness stated that, when he spoke slowly and asked her about one thing, she was able to answer very well, but that it was apparently difficult for appellant to think in a connected manner. The witness stated that he was of the opinion that the guardianship of appellant's estate should continue, especially as appellant was suffering from diabetes and must pay attention to her dietary habits, because business worries and the necessity of making decisions might confuse her.

The witness also testified that he had observed appellant in the court room during the trial, and had seen her in court on another occasion during the preceding

year. Summing up his opinion as to appellant's condition, the witness stated:

"I think there are two reasons why she, in my opinion is not entirely competent. In the first place, the diabetes, if not perfectly cared for, will produce periods when she is semiconscious or unconscious, and so on. Secondly, I saw her when she was perfectly controlled from insulin, and at that time there was an emotional disturbance, and an inability to think in a connected way if you hurried her at all. I believe there are many times when one could talk slowly and carefully with Mrs. Nelson, much of the time, probably, when she would answer correctly and be perfectly clear, but my impression was that she might be led rather easily, that she would rely on peoples' opinions too much, perhaps. However, that was entirely a guess on my part. I did notice that if you talked to her rapidly she would lose the point. If you talked as rapidly as I am talking she had difficulty following you and giving full responses. I think she should have someone watching over her affairs to some degree, and I think in that way she is incompetent. I think it would be to her best interests to have that done."

When the witness saw appellant in 1939, she was sick in a hospital. It is not surprising that during a lengthy examination she became somewhat confused and bewildered. On cross-examination the witness stated that, from his observation of appellant in the court room, he was of the opinion that her condition might have improved somewhat since he saw her in 1939.

We have considered the testimony carefully and discussed it at considerable length, realizing that the question to be here determined is important and that, before reaching a conclusion thereon, the record should receive careful consideration.

It clearly appears that, while appellant was living in Anacortes and while she was visiting in California, she at times suffered severely from insulin shock, the

shocks resulting in a condition of semiconsciousness or unconsciousness. It seems that, during the times referred to, appellant was not taking the insulin under the immediate supervision of any expert. It appears beyond question that, up to the date of the hearing, appellant, while under the care of Mrs. Schultz, received careful attention and has suffered no insulin shocks. It seems probable that with competent care appellant should not in the future suffer from such shocks.

■ It is not the law that, merely because one who suffers from some physical malady may now and then be temporarily mentally disturbed or disabled for a few hours, he should be declared to be mentally incompetent to handle his own affairs and his property placed under the control of a guardian. Neither is it the law that guardians shall be appointed to take charge of the estates of persons who at times suffer emotional disturbances, or who appear to have difficulty in thinking connectedly when excited or hurried, where the mental processes appear otherwise normal.

Mrs. Cora W. Allmond testified to three occasions when appellant, during the years 1935 or 1936, had suffered from insulin shock. There can be no question as to the disastrous effects suffered by one laboring under insulin shock. That, however, has very little to do with the question of mental competency, and as appellant appears to recognize the necessity that she should receive particular care by a competent person, which necessity apparently she did not fully realize during the time she suffered these shocks, testimony similar to that last referred to is of slight materiality.

Oren Redfield, a brother of appellant and respondent, testified that in his opinion appellant was not competent to attend to her business affairs. At the time of the trial, September, 1940, Mr. Redfield had not

seen appellant for almost a year. Under all the circumstances, this testimony is entitled to scant consideration.

It appears that two doctors in Los Angeles, who had treated appellant during the month of March, 1939, wrote Mr. E. M. Barker, of Anacortes, who had acted as appellant's agent, advising him that Mrs. Nelson was sick and that her business affairs needed attention. Mr. Barker then filed the petition asking for letters of guardianship, and attached to the petition a letter from each of the California doctors. At the hearing on appellant's petition for discharge of her guardian, respondent's counsel offered Mr. Barker's petition, with the letters attached. Neither of the California doctors had testified by deposition, and neither was present at the trial. Appellant's counsel objected to the admission of the letters in evidence, stating that the matter was "all hearsay." The court ruled, "If the letters were a part of the petition, of course they will be admitted." At the second argument before this court, respondent's counsel read at length from one of the letters. Upon the record, the letters, while properly admitted in connection with Mr. Barker's petition as showing why the same was filed, are not evidence as to statements therein made concerning appellant's condition. In any event, all they show is that, when the letters were written, appellant had been and was suffering from insulin shock, due to the fact that she had evidently undertaken to take the insulin without expert assistance.

It appears from the record that bad feeling has for some time existed between respondent and his sister Arlie R. Mowry. While it is immaterial, the record clearly shows that appellant was dissatisfied with the appointment of a guardian for her estate before Mrs. Mowry had any opportunity to influence her. It would

seem that appellant might well feel some resentment because of the appointment of a guardian for her estate, without any notice to her. How respondent accounted to the court, at the time he testified in support of his petition for appointment as her guardian, for appellant's absence from the hearing, we do not know. Certainly, before appointing a guardian for an alleged incompetent, a court should insist upon seeing that person, unless it very clearly appears from disinterested testimony that such person cannot, or for some reason should not, appear before the court or be visited.

In its memorandum opinion, the trial court for the first time brought into the case two letters written to the court by appellant, dated respectively April 30 and May 5, 1939. The opinion states that these letters had been placed by the court in the file, for the inspection of counsel, but it does not appear that counsel, during the hearing, were advised of the existence of these letters, when an opportunity would have been available to examine appellant concerning the same, to find out the circumstances under which the letters were written, whether or not any other letters had been written, or other relevant and possibly material circumstances. Concerning these letters, the opinion states that the court was of the opinion that "in all good conscience" the letters could not be disregarded. Respondent argues that, in the absence of any request on the part of appellant's counsel to reopen the case and discuss these letters, appellant cannot complain of any weight which the court gave them. We are not in accord with this argument.

It seems clear that, under the circumstances disclosed by the record, the trial court erred in considering these letters. Had they been called to the attention of counsel during the trial, a different situation would have been presented. The trial court should

have adopted this course. The letters are not before us, although the memorandum opinion contains some quotations therefrom. Nothing was concealed or kept under cover, but the trial court erred in giving the subject matter of the letters, they not having been produced during the trial, consideration in forming a considered judgment on the issues. In view of our conclusion on the merits, the matter of these letters is immaterial, but we refer to the matter in order to state our opinion as to the way such letters should be dealt with by trial judges in cases tried to the court.

■ We are convinced that the evidence preponderates against the conclusion of the trial court, that appellant is mentally incompetent to manage her own business affairs. It appears beyond question that appellant's mind still functions to a great extent normally. She is perfectly capable of knowing what she enjoys and what she wants, and of deciding what she desires to do and what she desires not to do. It is, of course, significant that, sick and suffering as she is, neither respondent nor anyone else has suggested that any necessity exists for the appointment of a guardian for appellant's person. Of course, she is physically weak, she is nervous, and, when tired and thereby rendered more nervous than usual, her mind does not react as keenly or quickly as normally it does, or as it did years ago. There is nothing surprising in this condition, and all things considered, it would seem that appellant is in better condition mentally than would ordinarily be expected.

This case falls well within the principle recently expressed by this court, *In re Michelson,* 8 Wn. (2d) 327, 111 P. (2d) 1011, where we said:

"The unsoundness of mind which would justify the appointment of a guardian must be more than a mere debility or impairment of memory. It must be such as

to deprive the person affected of ability to manage his estate. If the person for whom a guardian is sought is capable of transacting the ordinary business involved in taking care of his property, and if he understands the nature of his business and the effect of what he does, and can exercise his will with reference to such business, notwithstanding the influence of others, he is not of unsound mind, and a guardian should not be appointed for his property. . . .

"Guardians should not be appointed either of the person or of the property of one simply because he is aged or infirm, or because his mind is, to some extent, impaired by age or disease."

The trial court erred in refusing to grant appellant's petition for the discharge of respondent as guardian of her estate, and for the closing of the guardianship. On the oral argument, respondent's counsel stated that respondent desired no compensation for his services, and in our opinion he is not entitled to any.

The order appealed from is reversed, with instructions to proceed in accordance with the views herein expressed.

MAIN, MILLARD, BLAKE, JEFFERS, and DRIVER, JJ., concur.

SIMPSON, J. (dissenting)—March 22, 1939, J. Frank Redfield filed a petition in the superior court of Skagit county alleging that Ethel Nelson was a mentally incompetent person and asked that he be appointed guardian of her estate. A hearing was had upon the petition, after which, April 13, 1939, the court entered an order to the effect that Ethel Nelson was mentally incompetent.

It is the settled law that every person is presumed to be sane and competent, but that, when one is adjudged to be of unsound mind and under guardianship, the presumption arises in favor of the continued exist-

ence of the incompetency, and if recovery is claimed to have occurred the burden of proving it is upon the person making the allegation. 32 C. J. 757; *In re Brown,* 39 Wash. 160, 81 Pac. 552, 109 Am. St. 868, 1 L. R. A. (N. S.) 540; *State ex rel. Thompson v. Snell,* 46 Wash. 327, 89 Pac. 931, 9 L. R. A. (N. S.) 1191; *Roberts v. Pacific Tel. & Tel. Co.,* 93 Wash. 274, 160 Pac. 965; *Criez v. Sunset Motor Co.,* 123 Wash. 604, 213 Pac. 7, 32 A. L. R. 627; *Fletcher v. Miller,* 185 Wash. 299, 52 P. (2d) 304; *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331; *Kirsher v. Kirsher,* 120 Iowa 337, 94 N. W. 846; and *Fendler v. Roy,* 331 Mo. 1083, 58 S. W. (2d) 459.

At the hearing September 17, 1940, upon the application to have Mrs. Nelson adjudged competent, the burden was upon her to prove that she had recovered. In considering the evidence, it must be borne in mind that we are not warranted in disturbing the judgment unless the evidence preponderates against the findings of the trial court. *In re Jones' Estate,* 178 Wash. 433, 34 P. (2d) 1111.

The testimony was in conflict. The experts testifying for Mrs. Nelson were of the opinion that, as stated by the majority, Mrs. Nelson was competent at the time of the trial. The trial court, however, must have been influenced by Mrs. Nelson's behavior on the witness stand, her attitude and conduct during the progress of the trial, and the testimony of Mrs. Allmond, J. Frank Redfield, Oren Redfield, and Dr. E. D. Hoedemaker.

Mrs. Allmond testified as follows, concerning an incident that occurred prior to the first hearing:

"She did have hallucinations; she would see people coming in at the window, she would find things under the chairs. It was quite a large party and we asked her to go into the kitchen and I gave her half a cupful of sugar, eventually, and she went in and sat by me and she was quiet the rest of the evening. I drove and took her home and took her into the house. The next

day I went down feeling I had been rather sharp about it—feeling she could not understand why—I went with the idea of apologizing, and discovered that she hadn't any remembrance of having been there, and so I just passed it off and said nothing about it."

Frank and Oren Redfield, brothers of Mrs. Nelson, testified that she was mentally incompetent, and based their conclusions upon personal observations. Dr. Hoedemaker testified:

"A. The first time I saw her was April 27, 1939, at the request of Dr. Lester Palmer who was treating her at the Virginia Mason Hospital. . . . I spent about three-quarters of an hour with her in an attempt to determine her competency. Dr. Palmer had asked me to see her for that purpose only. She told me something of her earlier history, her life in Michigan; told me she had diabetes and had to be careful taking insulin; she said her memory was getting bad; she got nervous when she had too much insulin, and that at times it was difficult for her to concentrate. She told me she was living with a brother at Seward Park, who recently had had guardianship proceedings instituted. She said she learned about the guardianship when she returned on the Friday before. I saw her April 27, 1939, she said the purpose of the guardianship was to protect her from business worries. She told me something about some difficulties about some collections in Anacortes. She was quite vague about what she told me, and I haven't exact notes, but I remember distinctly that she wandered somewhat in describing these properties and collections, and if I talked rapidly, or asked her questions at a conversational rate she became easily confused and I had to ask each question carefully and slowly. I asked her about dates and so on, and she became confused and had to look at the newspaper to tell me what day it was. This was on the day, I think that she was to leave the hospital. She knew the hospital and remembered who her doctor was, and various happenings in the hospital during her stay, fairly well. She then went into the history of her school at Mt. Pleasant and her degree from the University of Chi-

cago. She denied any delusions and hallucinations and questions of that sort. She said if she got nervous that she wanted to cry at times, and felt lonely and would prefer to be in Anacortes rather than Seattle. During the examination she had an involuntary laugh that seemed unrelated to what we were talking about. I concluded it might have been an habitual laugh, but it seemed out of place during the examination. I noted that during the conversation she became disconnected and confused when attempting to make complete sentences and when attempting to carry out one that business—this was noticeable in trying to explain her business dealings in Anacortes. When I took quite a lot of time and asked her one thing she was able to answer it very well. It was apparently difficult for her to think in a connected manner. On the basis of that examination I did remark that I would like to examine her Neurologically. I didn't do it at that time, but on the basis of my examination I was of the opinion that the guardianship should continue, especially inasmuch as she had diabetes and must pay attention to her dietary habits, and thought business worries and the necessity of making decisions might be enough to confuse her. That is the nature of my examination of April 27, 1939. On August 9, 1939, I was asked to call on her at the nursing home in Rainier Valley, where she is staying now. I was prevented from examining her by the nurse who was there. . . . Q. Have you seen her about the court room today? A. Yes. Q. Did you see her last year when she was here in the court room when we had another hearing here? A. Yes, I did. Q. Have you heard these other witnesses express an opinion and testify as to what her condition is and heard her testify this morning, and been able with what you have gleaned from your examination to give us an opinion as to whether or not she is a proper subject to manager her own affairs physically and financially? A. I think I have formed an opinion about that. Q. Will you tell us what your opinion is, and why? A. I think there are two reasons why she, in my opinion, is not entirely competent. In the first place, the diabetes, if not perfectly cared for, will produce periods when she is semi-conscious or unconscious, and so on.

Secondly, I saw her when she was perfectly controlled from insulin, and at that time there was an emotional disturbance, and an inability to think in a connected way if you hurried her at all. I believe there are many times when one could talk slowly and carefully with Mrs. Nelson, much of the time, probably, when she would answer correctly and be perfectly clear, but my impression was that she might be led rather easily, that she would rely on peoples' opinions too much, perhaps. However, that was entirely a guess on my part. I did notice that if you talked to her rapidly she would lose the point. If you talked as rapidly as I am talking she had difficulty following you and giving full responses. I think she should have someone watching over her affairs to some degree, and I think in that way she is incompetent. I think it would be to her best interests to have that done."

The trial court, in a comprehensive memorandum opinion, stated:

"Mrs. Nelson is a chronic diabetic. For sixteen years she has been known to have been suffering from this incurable ailment, and at this time her only chance for existence depends upon the daily accurate measurement of her food and insulin. While testifying her voice was weak, she mumbled her words, and at times was inaudible. To the court Mrs. Nelson presented the appearance of one who has almost reached a condition of total physical collapse. Mrs. Nelson's answers to questions propounded to her were responsive and logical. This also appears from her letters, Petitioner's Exhibits 1 and 2. But this fact does not necessarily establish her competency to manage her business affairs. (Re: Bayers Estate 101 Wash. page 698)

"Most, if not all of the questions asked Mrs. Nelson by her counsel on direct examination were from a prepared typewritten list. After each question was asked a long period of time would elapse before Mrs. Nelson was able to make reply; there appearing to be great difficulty in Mrs. Nelson being able to remember, and to collect her thoughts sufficiently before being able to reply. . . .

"On cross examination this difficulty seemed harder for Mrs. Nelson to overcome, hence more time was required for her to make reply to questions asked her. An answer made by Mrs. Nelson on cross examination as to the sale of one of her automobiles fairly well illustrates her manner: 'Question: How much did you sell that for?' 'Answer: I sold that for—I can't just recall, but never mind, I can recall if I think about it for a while.'

"It is the court's opinion that if Mrs. Nelson had been asked questions at the ordinary rate, or even at a conversational rate, she would have been incapable of answering correctly, or at all. During the examination she was given her own time in which to reply to questions propounded to her. . . .

"Dr. Hoedemaker, an expert witness called on behalf of the guardian, in commenting on her condition stated that he thought Mrs. Nelson had some cerebro arterio sclerosis as a complication of her diabetes and her insulin treatment. Dr. Hoedemaker also expressed the opinion that Mrs. Nelson was not entirely mentally competent, and that she should have someone over her affairs.

"The witnesses called by the petitioner, other than her expert physicians, expressed their opinions as to Mrs. Nelson's mental competency upon their acquaintanceship and contacts with Mrs. Nelson. While, on the other hand, Mrs. Allmond, a very near friend of Mrs. Nelson, stated that by reason of Mrs. Nelson's physical exhaustion she noticed a like slowing of her mental processes. Mrs. Allmond also related occasions when she had seen Mrs. Nelson in an unconscious, or a semiconscious condition. The guardian, J. Frank Redfield, and his brother Oren Redfield, were of the opinion that their sister, Mrs. Nelson, was not mentally competent.

"Mrs. Mowry and Mrs. Schultz completely dominate and control Mrs. Nelson physically and mentally. They tell Mrs. Nelson whom to see and whom not to see. They refuse the physician specialist in attendance. They have created in Mrs. Nelson's mind a distrust and a dislike for the guardian, on which we will comment later.

"After due consideration the court finds that the pe-

titioner, Ethel Nelson, should not be adjudged competent to manage her estate, but that Ethel Nelson at the time of the apointment of her brother, J. Frank Redfield, as guardian of her estate was mentally incompetent and at all times since has been and now remains mentally incompetent."

The evidence did not preponderate over the findings of the trial court and its judgment should be affirmed.

ROBINSON, C. J., concurs with SIMPSON, J.

STEINERT, J. (concurring in part and dissenting in part)—I am of the opinion that the present guardian should be removed, not only because of the manner in which he secured his appointment, but also because he is not, under the facts shown, a proper person to have charge of the estate. I am further convinced, however, that Mrs. Nelson is utterly incapable of managing her estate, which is of considerable size and requires constant attention and supervision by some capable person. The guardianship proceeding should, therefore, not be terminated, thereby restoring full control to Mrs. Nelson, but, rather, should be continued for the purpose of selecting a guardian who is qualified to conserve and manage her estate properly, for, otherwise, it will either be frittered away entirely or else will be exposed to serious complications and loss.