IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ROBIN LERUM,<br><br>          Appellant,<br><br>          v.<br><br>CITY OF BELLEVUE; the BELLEVUE POLICE DEPARTMENT; CITY OF SEATTLE; and the SEATTLE POLICE DEPARTMENT,<br><br>          Respondent. | No. 87665-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — In 2019, a vehicle driving on the shoulder of the freeway struck Robin Lerum's car. At the time of collision, a Seattle police officer and Bellevue police officer were on motorcycles behind the stolen vehicle on the shoulder. Lerum sued the City of Seattle and the City of Bellevue for negligent pursuit and failure to give due regard to her safety. The City of Seattle and City of Bellevue moved for summary judgment dismissal. The trial court granted the Cities' motions for summary judgment. Lerum appealed claiming the trial court erred when it granted the motions for summary judgment because issues of fact existed as to whether a pursuit occurred and whether the pursuit was a proximate cause of her injuries. We find issues of fact exist, and we reverse and remand for further proceedings.

FACTS

Background

On the morning of October 31, 2019, Seattle Police Department (SPD) Officer Gary Davenport and Bellevue Police Department (BPD) Officer Robert Welty were traveling northbound on the I-5 freeway. Both officers were in the HOV lane on their way to work. Officer Davenport was several vehicles in front of Officer Welty. Traffic was stop and go because of an earlier accident, and the officers were moving at approximately five to ten miles per hour.

While slowly moving in the left lane, Officer Welty heard a loud noise and then saw a black SUV speed by him on his left, on the shoulder of the freeway. Officer Welty estimated the vehicle was going in excess of 50 miles per hour. A couple seconds later, the SUV passed Officer Davenport.

After the SUV passed Officer Davenport, he moved to the left, onto the shoulder, to see if he could get a visual on the vehicle and see where and how far it was traveling. Officer Davenport estimated the car was traveling approximately 100 miles per hour when it passed him. He testified that he did not believe the car was committing a felony, but deemed the car was engaged in negligent and reckless driving. Officer Davenport increased his speed slightly and remained moving at 15 to 20 miles per hour on the shoulder as the SUV sped ahead. Officer Davenport also turned on his emergency lights to "provide an awareness to all the drivers that were ahead that there's a vehicle driving at a high rate of speed" and alert them to the "dangerous situation." Officer

2

Davenport was not aware there was another motorcycle officer (Officer Welty) behind him.

Officer Welty observed Officer Davenport move onto the shoulder after he was passed by the SUV. Officer Welty also moved onto the shoulder to "investigate." At the time, Officer Welty testified he believed the speeding vehicle was a family member driving to the scene of the collision ahead. Officer Welty maintained a speed of approximately 20 miles per hour and initiated his rear emergency lights only. Officer Welty testified that shortly after he pulled onto the shoulder, the SUV crested a hill and went out of sight.

Officer Davenport was able to maintain eyesight with the SUV as the distance between his motorcycle and the SUV increased. Shortly after Officer Davenport moved onto the shoulder—Officer Davenport estimated about six seconds—the SUV collided with a vehicle in the HOV lane to the right of the shoulder. About 450 feet ahead of where the collision occurred, the shoulder narrowed from about 10 feet to 4 feet wide.

The SUV hit a vehicle occupied by Robin Lerum and her daughter, Jordyn Myers. Officer Davenport followed Lerum and Myers to the hospital after the accident and stayed at the hospital for about four hours. In her declaration, Myers indicated she overheard a conversation between Officer Davenport and her husband, who also worked for SPD. Myers contends Officer Davenport told her husband the SUV was within its lane of travel but "driving too fast for his liking," so he pursued the SUV. According to Myers, Officer Davenport then told her husband he got behind the SUV, at which point the SUV accelerated and

3

began driving on the shoulder, and Officer Davenport followed. Myers claims Officer Davenport ended the conversation by stating that the vehicle he was "after" was the one that crashed into her vehicle.

In her declaration, Myers recounts that Detective John Ford from SPD came into her hospital room to check on her and update her about the investigation. According to Myers, Detective Ford told her, "[t]he man who we learned was driving [the SUV] said he saw that the police were after them, so he got onto the left shoulder and accelerated to get away because he said he 'got spooked.' "

At the hospital, on the day of the collision, Detective Ford also interviewed the occupants of the SUV, Oscar Hernandez-Buenrostro and Ernesto Rojas-Renteria. In his interview, Hernandez-Buenrostro falsely told Detective Ford that Rojas-Renteria was driving the vehicle when they got onto the freeway. He stated that they saw a cop when they entered the freeway,[1] and he told Rojas-Renteria to "watch out." According to Hernandez-Buenrostro, Rojas-Renteria sped up and then Hernandez-Buenrostro did not see a cop behind them anymore, but he said that he "saw the lights" and told Rojas-Renteria to slow down. Hernandez-Buenrostro estimated Rojas-Renteria was driving "[m]aybe 120, 130" miles per hour. Hernandez-Buenrostro admitted to smoking cannabis and methamphetamine that day.

---

[1] A state trooper was parked at the on ramp where Hernandez-Buenrostro and Rojas-Renteria entered onto the freeway. The trooper did not follow the SUV after it merged onto the freeway.

4

Rojas-Renteria provided a different version of events during his interview with Detective Ford. Rojas-Renteria stated Hernandez-Buenrostro was the driver. Similar to Hernandez-Buenrostro, Rojas-Renteria said they saw a state patrol vehicle when they entered the freeway, but the patrol car did not try to pull them over. He stated that once they hit the flat part of the freeway, Hernandez-Buenrostro "started smashing through the outside" and going to the left. Then, Rojas-Renteria "saw a motorcycle officer" and he told Hernandez-Buenrostro to stop, but Hernandez-Buenrostro said no. Rojas-Renteria said he thought they were going "from 60, 70, 80" miles per hour. He noted that Hernandez-Buenrostro tried to brake once the shoulder narrowed, but he could not control the car.

Hernandez-Buenrostro subsequently pleaded guilty to vehicular assault and admitted driving in a reckless manner, causing the collision and substantial bodily harm to Lerum. Hernandez-Buenrostro stated he was "speeding and passing on the shoulder after consuming [cannabis] and methamphetamine and caused a 5-car crash."

In November 2022, Lerum initiated a complaint against the City of Seattle (Seattle) and the City of Bellevue (Bellevue)[2] claiming Officer Davenport and Officer Welty negligently pursued the SUV, violated police policies, failed to give due regard to Lerum's safety, and contributed to the collision. Both Seattle and Bellevue moved for summary judgment, contending insufficient admissible

---

[2] Where applicable, Seattle and Bellevue will be referred to collectively as the "Cities."

evidence existed to support Lerum's claims of negligence. The Cities both maintained they did not owe Lerum a duty because the officers were not engaged in a pursuit. And, even if the Cities had owed a duty, Lerum presented no evidence to establish the Officers' actions proximately caused the collision. Bellevue specifically contended that no evidence existed to establish Hernandez-Buenrostro saw Officer Welty and, as a result, increased his speed.

In support of its motion for summary judgment, Seattle submitted a declaration from accident reconstructionist, Nathan Rose. Rose reviewed the evidence and materials in the case and prepared a report outlining his analysis and opinions on the incident. Rose concluded, among others, that before Hernandez-Buenrostro applied the brakes, the SUV was going at least 60 miles per hour, and the SUV was travelling approximately 50 to 55 miles per hour when it hit Lerum's vehicle. Rose opined that from the time Officer Davenport reached 20 miles per hour after entering the shoulder until the time of collision, approximately 9.8 to 17.6 seconds elapsed.

In response to the Cities' motions for summary judgment, Lerum retained Russ Hicks, a law enforcement practices expert, to prepare a report evaluating whether Officer Davenport's and Officer Welty's actions violated law enforcement policies. Hicks's report relied on applicable law enforcement policies and training materials, relevant RCWs, and depositions and interviews related to the incident. These included the interviews with Hernandez-Buenrostro, Rojas-Renteria, and Myers's declaration. Based on his review of the record, Hicks concluded the following:

6

- Hernandez-Buenrostro drove onto the shoulder only after Officer Davenport got behind him.

- The SUV accelerated to 80 to 100 miles per hour to flee Officer Davenport before it crashed into Lerum's vehicle.

- Officer Davenport engaged in a de[]facto pursuit[3] of the SUV, violating law enforcement policies and standards.

- Alternatively, Office Davenport engaged in a "ghosted pursuit."[4]

- Because Officer Davenport initiated a pursuit, Hernandez-Buenrostro eluded the officer.

- Officer Welty engaged in a de[]facto pursuit of the SUV, violating law enforcement policies and standards.

- Officer Welty's actions of pulling onto the shoulder and activating his rear emergency lights only was a violation of law enforcement policies and standards.

- Both officers violated police policies by engaging in a pursuit in response to a misdemeanor traffic violation.

Lerum's response in opposition to the Cities' motions for summary judgment also relied on the declaration of Jeremy Bauer, an accident reconstructionist. Bauer concluded the following:

a. [t]here were no visual obstructions that would have prevented the driver of the [SUV] from seeing both officers on their motorcycles as they drove on the shoulder of the Interstate;

b. [t]he statements made by the occupants of the [SUV] confirming they saw lights and law enforcement behind them before the collision, corroborate the absence of visual obstructions between the [SUV] and the officers on the shoulder of the interstate in the moments leading up to the collision;

c. [t]he driver of the [SUV] had a reasonable amount of time to observe the lights on Officer Davenport's motorcycle, notice both motorcycles on the shoulder of the interstate, but refused to stop.

---

[3] A de facto pursuit is when the officer does not activate their emergency lights and sirens.

[4] The International Association of Chiefs of Police coined the phrase "ghosted pursuit" to describe when officers engage in vehicle pursuit without reporting the incident.

In their replies, Bellevue and Seattle moved to strike the interviews with Hernandez-Buenrostro and Rojas-Renteria.[5]  The Cities contended the interviews were hearsay and were inadmissible as substantive evidence.  Seattle also requested the court exclude the statements of Officer Davenport as set forth in Myers's declaration.  The Cities both asserted that Hicks's opinions should be excluded because they were mere factual determinations that relied on the hearsay statements made by Hernandez-Buenrostro and Rojas-Renteria.[6]

In December 2024, the court held a hearing on the Cities' summary judgment motions.  During the hearing, the court determined the interviews of Hernandez-Buenrostro and Rojas-Renteria would be inadmissible for all purposes.  The court did not address the admissibility of Myer's declaration.  Following the hearing, the court granted the Cities' motions for summary judgment and issued an order memorializing the bench ruling excluding the statements of Hernandez-Buenrostro and Rojas-Renteria.  In each of the orders granting summary judgment, the court noted it did not find proximate cause:

> The Court does not find proximate cause.  Specifically, the court does not find that but/for Officer [Davenport's/Welty's] actions, the driver—who was speeding and driving under the influence of drugs—would not have caused the accident.

Lerum appeals both orders granting summary judgment.

---

[5]  Bellevue moved separately to exclude the interviews of Hernandez-Buenrostro and Rojas-Renteria.

[6]  Seattle moved separately to exclude the opinion testimony of Hicks.  This motion was scheduled for a later hearing, which did not take place because the summary judgment motion was granted before that date.

ANALYSIS

Summary Judgment

Lerum contends the court erred when it granted the Cities' motions for summary judgment because there are issues of fact as to whether Officer Davenport and Officer Welty engaged in a pursuit of the SUV and whether the pursuits were a causal factor of the collision. Both Bellevue and Seattle claim no admissible evidence supports the conclusion a pursuit occurred or that the Officers' actions were a proximate cause of the collision. We conclude that issues of fact exist as to whether Officer Davenport and Officer Welty engaged in a pursuit.

We review a trial court's decision to grant summary judgment de novo. *Lakey v. Puget Sound Energy, Inc*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013). We also review de novo a trial court's "ruling on a motion to strike evidence made in conjunction with a summary judgment motion." *Rice v. Offshore Systems, Inc.*, 167 Wn. App. 77, 85, 272 P.3d 865 (2012).

A party is entitled to summary judgment as a matter of law when no genuine issue exists as to any material fact. *Kofmehl v. Baseline Lake, LLC*, 177 Wn.2d 584, 594, 305 P.3d 230 (2013); CR 56(c). "A genuine issue of fact exists when reasonable minds could disagree on the facts controlling the outcome of the case." *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 569, 459 P.3d 371 (2020). All facts and reasonable inferences are viewed in the light most favorable to the nonmoving party. *Kofmehl*, 177 Wn.2d at 594.

9

The party seeking summary judgment "bears the initial burden of showing the absence of an issue of material fact." *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If the moving party meets this burden, the burden then shifts to the nonmoving party to show that facts support each element essential to their claim. *Young*, 172 Wn.2d at 225. Where there is " 'competing, apparently competent evidence,' " summary judgment is improper. *Woods View II, LLC v. Kitsap County*, 188 Wn. App. 1, 19, 352 P.3d 807 (2015) (quoting *Larson v. Nelson*, 118 Wn. App. 797, 810, 77 P.3d 671 (2003)).

The facts presented by the parties must be evidentiary in nature— conclusory statements of fact or speculation are insufficient. *Overton v. Consol. Ins. Co.*, 145 Wn.2d 417, 430, 38 P.3d 322 (2002); *Elon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 169, 273 P.3d 965 (2012). *Speculation* is "[t]he practice of theorizing about matters over which there is no certain knowledge." BLACK'S LAW DICTIONARY 1692 (12th ed. 2024). Conversely, circumstantial evidence is " 'evidence of facts or circumstances from which the existence or nonexistence of other facts may be reasonably inferred from common experience.' " *State v. Jackson*, 145 Wn. App. 814, 818, 187 P.3d 321 (2008) (quoting WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 5.01, at 124 (2d ed.1994)). At the summary judgment stage, "it is irrelevant whether the fact question arises from direct or circumstantial evidence." *Asphy v. State*, 31 Wn. App. 2d 605, 630, 552 P.3d 325, *review denied*, 3 Wn.3d 1033 (2024).

The facts must also be admissible; " 'unauthenticated or hearsay evidence does not suffice.' " *Spohn v. Dep't of Lab. and Indus.*, 20 Wn. App. 2d 373, 378-

79, 499 P.3d 989 (2021) (quoting *SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 141, 331 P.3d 40 (2014)).

When a party presents expert opinions to support their opposition to summary judgment, " '[t]he expert's opinion must be based on fact and cannot simply be a conclusion or based on an assumption.' " *Peterhans v. Univ. of Wash.*, 34 Wn. App. 2d 745, 755, 571 P.3d 322 (2025) (quoting *Volk v. DeMeerleer*, 187 Wn.2d 241, 277, 386 P.3d 254 (2008)). If the nonmoving party fails to produce sufficient facts to support the elements of their claim, summary judgment is proper. *Lake Chelan Shores Homeowners Ass'n v. St Paul Fire & Marine Ins. Co.*, 176 Wn. App. 168, 179, 313 P.3d 408 (2013).

<u>Negligence</u>

Lerum contends Officer Davenport and Officer Welty breached their duties owed to Lerum—both under common law and statute—and those actions were the proximate cause of her injuries. The Cities contend its respective officers did not have a duty to Lerum, and even if they did owe her a duty, they did not breach it. We conclude issues of material fact exist concerning both duty and causation; therefore, the trial court erred when it granted the Cities' motions for summary judgment.

"To prevail on a negligence claim, a plaintiff 'must show (1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the proximate cause of the injury.' " *Ehrhart v. King County*, 195

Wn.2d 388, 396, 460 P.3d 612 (2020) (internal quotation marks omitted) (quoting *N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 429, 378 P.3d 162 (2016)).[7]

### 1. Duty and Breach

"The threshold determination of whether a duty exists is a question of law." *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996). Whether a party breached a duty of care is generally a question of fact. *Meyers v. Ferndale Sch. Dist.*, 12 Wn. App. 2d 254, 262, 457 P.3d 483 (2020). But, breach "may be determined as a matter of law where reasonable minds could not differ." *Walter Family Grain Growers, Inc. v. Foremost Pump & Well Servs., LLC*, 21 Wn. App. 2d 451, 459-60, 506 P.3d 705 (2022).

"At common law, every individual owes a duty of reasonable care to refrain from causing foreseeable harm in interactions with others." *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 550, 442 P.3d 608 (2019) (citing RESTATEMENT (SECOND) OF TORTS, § 281 cmt. e (Am. Law Inst. 1965)). This duty applies to law enforcement and "encompasses the duty to refrain from directly causing harm to another through affirmative acts of misfeasance." *Beltran-Serrano*, 193 Wn.2d at 550. To impose liability for the negligent actions of law enforcement, the duty owed must be one owned to the injured person as an individual and " 'not merely the breach of an obligation owed to the public in general (i.e., a duty to all is a duty to no one).' " *Babcock v. Mason County Fire Dist. No. 6*, 144 Wn.2d 774, 785, 30 P.3d 1261 (2001) (internal quotation marks omitted) (quoting *Taylor v. Stevens County*, 111 Wn.2d 159, 163, 759 P.2d 447

---

[7] The Cities do not dispute Lerum suffered an injury.

(1988)). A violation of an adopted policy that sets a standard of care to be followed by employees may be considered as evidence of negligence. *See HBH v. State*, 197 Wn. App. 77, 93, 387 P.3d 1093 (2016).

SPD and BPD policies outline the duties of law enforcement officers with regard to emergency response procedures. SPD's policy on emergency vehicle operations defines "emergency response" as "an officer operat[ing] an authorized police vehicle in a matter that is substantially outside of a normal traffic pattern." According to the policies, officers may drive in an emergency response "only when the need outweighs the risk." (Capitalization omitted.) Under the policies, "[m]isdemeanor or property crimes do not justify an emergency response unless[] responding to an in-progress crime, [o]r [w]here there is a legitimate concern for the preservation of life."

Under SPD policies, a pursuit occurs "when an officer, in an effort to keep pace with and/or immediately stop or apprehend an eluding driver, drives in a matter that is outside of normal traffic restrictions." (Emphasis omitted.) "Eluding" occurs when,

> an officer operating an authorized police vehicle issues by hand, voice, emergency lights or siren a visual and/or audible signal to the driver of a vehicle to stop and, after a reasonable time to yield in response to the officer's signal, the driver does any of the following:
> - Increases speed
> - Takes evasive actions
> - Refuses to stop.

SPD policies also direct officers in pursuit to use lights and sirens "as necessary to warn others of the emergency nature of the situation." (Capitalization omitted.)

BPD policies also outline the requirements for responding to emergency situations and engaging in pursuits. BPD policies state, "[w]here no emergency exists (i.e., routine calls for service), officers will proceed without the use of emergency equipment and in compliance with all traffic regulations." When responding to an emergency, officers shall "evaluate the net benefit (giving due regard to the risk) of exercising the emergency vehicle privileges set forth in RCW 46.61.035."

BPD policies outline factors that "shall be considered by every officer when responding to an emergency call." The factors include safety of the public in the area, volume of vehicular and pedestrian traffic, and the speeds involved. The policies state that circumstances may exist where the use of emergency equipment may not be desirable, such as when the "use of the emergency equipment may alert the suspect to the approaching police." If an officer chooses not to use the vehicle's emergency equipment, "the officer will obey all traffic regulation."

BPD policies define "pursuit" as,

> [a] vehicle attempt to apprehend the occupant(s) of a motor vehicle when the driver has been requested or signaled to stop by a uniformed officer operating a marked police vehicle and giving such signal by using a hand, voice, emergency light or siren, AND the driver is resisting apprehension by maintaining or increasing the vehicle's speed or otherwise maneuvering his/her vehicle in such a manner as to elude the officer.

The policies provide that lights and sirens are required continuously through a pursuit. Pursuits for traffic violations, misdemeanors, gross misdemeanors and property crimes alone are prohibited under BPD policies. The policies also

define "paralleling" or "trailing," which is when an officer drives parallel to the pursuit route or trails at a safe distance behind the pursuit route with lights and sirens engaged.

In addition to duty arising from department policies, duty can arise out of statutory authority. *Mason v. Bitton*, 85 Wn.2d 321, 325, 534 P.2d 1360 (1975). Under RCW 46.61.035(4), the driver of an authorized emergency vehicle has a duty "to drive with due regard for the safety of all persons" and the driver is responsible for "the consequences of his or her reckless disregard for the safety of others." RCW 46.61.035 provides, in relevant part, operators of authorized emergency vehicles, "when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law," may

> (a) [p]ark or stand, irrespective of the provisions of this chapter;
> (b) [p]roceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;
> (c) [e]xceed the maximum speed limits so long as he or she does not endanger life or property;
> (d) [d]isregard regulations governing direction of movement or turning in specified directions.

The privileges set forth in RCW 46.61.035 apply only when the vehicle is making use of visual signals meeting the requirements of RCW 46.37.190. RCW 46.37.190 requires every authorized emergency vehicle to "be equipped with at least one lamp capable of displaying a red light visible from at least 500 feet in normal sunlight and a siren capable of giving an audible signal." Additionally, under RCW 46.61.035, "authorized emergency vehicles shall use

15

audible signals when necessary to warn others of the emergency nature of the situation."

> a. *Pursuit*

Here, the Cities claim a duty exists only if a pursuit occurred, and both Cities maintain no pursuit occurred. Seattle contends Officer Davenport did not engage in a pursuit because no evidence indicates that Officer Davenport activated his siren or made any effort to keep pace with or immediately apprehend Hernandez-Buenrostro. Seattle points to Officer Davenport's deposition where he testified that he was not trying to catch up with the SUV and his intention for turning on his light was to warn vehicles ahead that a dangerous driver was coming up on their left. But, Officer Davenport's intentions for his actions are not determinative—what is relevant at the summary judgment stage is the fact that he engaged in those actions at all. Officer Davenport activated his light and moved onto the shoulder behind the SUV. SPD policy does not require an authorized emergency vehicle to signal with both lights and a siren to effectuate a pursuit—the use of lights alone may support the finding of a pursuit. Accordingly, Officer Davenport's movement onto the shoulder and use of his light creates an issue of fact as to whether he engaged in a pursuit.

Similarly, Bellevue maintains no evidence exists that Office Welty signaled for the SUV to stop or that Hernandez-Buenrostro was "resisting apprehension." Bellevue cites to Officer Welty's deposition where he testified he was not chasing the SUV, he was merely "interested in knowing where [the SUV] was going" and was "going to investigate." But, like Officer Davenport, Officer Welty's

16

explanation of his actions does not establish the absence of a pursuit for the purposes of summary judgment. Officer Welty turned on his rear-facing light and moved onto the shoulder. BPD policies do not distinguish between rear-facing lights and other emergency lights for the purpose of a pursuit. Therefore, an issue of fact exists as to whether Officer Welty's actions are consistent with the definition in BPD's policy of signaling the SUV to stop.

### b. Eluding

Next, the Cities contend a pursuit did not occur because no admissible evidence exists to support the conclusion that Hernandez-Buenrostro intended to elude either Officer Davenport or Officer Welty.[8] The Cities claim Lerum relies on inadmissible evidence to contend Hernandez-Buenrostro saw Officer Davenport or Office Welty and, in response, took evasive actions, such as increasing speed or refusing to stop.[9]

But Bauer relied on the data in Rose's report to conclude there was a reasonable amount of time between when Officer Davenport and Officer Welty turned on their lights and when the SUV crashed for the occupants of the SUV to

---

[8] The Cities contend Russ Hicks's report relies on the inadmissible interviews of Hernandez-Buenrostro and Rojas-Renteria and Myers's declaration in reaching his conclusions. While some of Hicks's conclusions were supported by the inadmissible interviews, he also relied on admissible evidence, such as the officers' testimony, facts underlying the crash, applicable SPD policies, and law enforcement training materials.

[9] The only evidence supporting Hicks's conclusion that Hernandez-Buenrostro increased his speed after seeing Officer Davenport is based on Myers's declaration. Seattle contends this evidence is inadmissible because it is hearsay, but the trial court never ruled the declaration inadmissible. Because enough evidence creates a material issue of fact without Myers's declaration, we need not address its admissibility.

17

see the lights and react. While Rose's report noted that the SUV's speed at the time of impact was not a marked increase from even the lowest estimate provided by witnesses, that finding does not establish that Hernandez-Buenrostro did not maintain speed prior to the collision. And maintaining speed may be indicative of a refusal to stop. Based solely on Bauer's report, a reasonable person could infer that Hernandez-Buenrostro saw either of the officers' lights and engaged in eluding behavior by maintaining his speed and refusing to stop.

In addition to contending Lerum's experts relied on inadmissible evidence, the Cities claim Lerum's experts' opinions do not create a triable issue of fact. The Cities contend Hicks's opinions are merely conclusory statements and do not involve the application of specialized knowledge. Specifically, Seattle maintains that because Hicks did not perform a forensic speed analysis or accident reconstruction analysis, the subject matter is not within Hicks's area of expertise. But analyzing law enforcement procedures and practices is precisely the type of work that Hicks specializes in.[10]

The Cities also insist any opinions that Hernandez-Buenrostro "could have seen" Officer Davenport or Officer Welty are purely speculative and are insufficient to withstand summary judgment. Both Seattle and Bellevue cite to *Harder v. City of Seattle*[11] to support the contention that there is a lack of proximate cause, but the facts of that case are distinguishable. In *Harder*, Officer

---

[10] Even the trial court noted Hicks was "clearly qualified."

[11] No. 85812-1-I (Wash. Ct. App. Oct. 28, 2014) (unpublished), https://www.courts.wa.gov/opinions/pdf/858122.pdf

Stevenson followed Payton Maddy for approximately a minute and a half through a neighborhood in North Seattle before Maddy hit David Harder's motorcycle, killing him. No. 85812-1-I, slip op. at 1. Harder's estate sued the City of Seattle, alleging negligence. *Id.* at 4. Seattle moved for summary judgment, contending no evidence existed to support a claim that Officer Stevenson's actions were a proximate cause of the collision. *Id.* at 4-5. The estate opposed the motion, claiming "Officer Stevenson's conduct was a proximate cause of the collision because Maddy's erratic driving shows that he was fleeing from Officer Stevenson." *Id.* at 6. The trial court granted the City's motion. *Id.* at 7. On appeal, we affirmed the trial court, noting "no affirmative evidence that Maddy saw Officer Stevenson" existed. *Id.* at 15.

There are two distinguishing elements in *Harder*. First, in *Harder*, the expert testimony concluded that there were only a few seconds where Maddy could have possibly seen Officer Stevenson.[12] *Id.* at 14. Here, while there is dispute as to how much time passed between when the officers turned on their lights and when the collision occurred, it was somewhere between 6 to 17.6 seconds. Additionally, unlike *Harder*, where Maddy was making multiple turns, there was a straight line of sight between the SUV and the officers.

Second, in *Harder*, Maddy testified multiple times that he did not see Officer Stevenson. No direct testimony contradicted Bauer's inference that,

---

[12] One expert testified Maddy would have had the ability to see Officer Stevenson's lights activated for a total of five seconds. *Harder*, No. 85812-1-I, slip op. at 5-6. Another expert estimated there were only four, split second, opportunities where Maddy could have seen Officer Stevenson following him. *Id.*

based on the facts of the case, Hernandez-Buenrostro could have seen either officer. While Officer Welty testified the SUV crested a hill and went out of sight, Bauer's report concluded that, while there was a slight rise in the road, no roadway obstructions prevented Hernandez-Buenrostro from seeing Officer Davenport or Officer Welty. Contrary to Seattle's assertion, Bauer's conclusion did not rely on the inadmissible statements of Hernandez-Buenrostro and Rojas-Renteria; instead, his conclusions relied on the testimony of the officers and images from the freeway where the incident occurred.

The admissible portions of Hicks's and Bauer's opinions raise genuine issues of fact as to whether a pursuit occurred and, as such, whether the officers breached their duties under their respective police department policies.

2. Causation

Lerum contends sufficient evidence exists to create an issue of material fact as to whether the actions of Officer Welty and Officer Davenport were a proximate cause of the collision. The Cities claim Lerum presents no admissible evidence to establish cause in fact. We agree with Lerum.

Proximate causation requires two elements: cause in fact and legal causation. *Little v. Countrywood Homes, Inc.*, 132 Wn. App. 777, 780, 133 P.3d 944 (2006). Cause in fact " 'refers to the physical connection between an act and an injury.' " *Cho v. City of Seattle*, 185 Wn. App. 10, 16, 341 P.3d 309 (2014) (internal quotation marks omitted) (quoting *M.H. v. Corp. of Catholic Archbishop of Seattle*, 162 Wn. App. 183, 194, 252 P.3d 914 (2011)). Typically, cause in fact is a question for the jury, "but it may be decided as a matter of law if the causal

connection between the act and the injury is 'so speculative and indirect that reasonable minds could not differ.' " *Cho*, 185 Wn. App. at 16 (internal quotation marks omitted) (quoting *Moore v. Hagge*, 158 Wn. App. 137, 148, 241 P.3d 787 (2010)). Conflicting views presented in declarations, deposition testimony, and expert reports as to whether the alleged breach was the cause of injury establishes a factual question and are sufficient to survive summary judgment. *Meyers*, 197 Wn. 2d at 265.

To demonstrate the existence of proximate cause, a party utilizes the "but for" test. *Smith v. Preston Gates Ellis, LLP*, 135 Wn. App. 859, 864, 147 P.3d 600 (2006). The plaintiff must establish that "but for" the defendant's conduct, the injury would not have occurred. *Smith*, 135 Wn. App. at 864. The claimant does not need to establish cause in fact with absolute certainty, it is enough to present evidence "sufficient to allow a reasonable person to conclude that the harm, more probably than not, happened in such a way that the moving party should be held liable." *Little*, 132 Wn. App. at 781. But evidence establishing proximate cause must amount to more than mere speculation. *Moore*, 158 Wn. App. at 154.

Here, the Cities contend Lerum presents no evidence to show Hernandez-Buenrostro saw Officer Davenport or Officer Welty and, as a result, increased his speed or took evasive action. But Lerum's experts' reports show that Hernandez-Buenrostro had the opportunity to see the officers behind him, and it is reasonable to believe Hernandez-Buenrostro reacted to the presence of the officers.

21

As discussed *supra*, Bauer concluded in his report that sufficient time elapsed between the officers activating their lights and the time of collision for Hernandez-Buenrostro to see either officer and respond. Additionally, Bauer noted no visual barriers existed to obstruct Hernandez-Buenrostro's view of the officers. Hicks's report, citing a Washington State Criminal Justice Training Commission manual, noted "fleeing drivers will more often than not continue to flee using evasive driving tactics."[13] Importantly, here, it is not necessary that Hernandez-Buenrostro increased his speed—eluding also includes taking evasive action or refusing to stop. Because there are conflicting expert opinions, supported by admissible evidence, causation cannot be determined on summary judgment.

Because genuine issues of material fact exist concerning breach of duty of causation, we conclude the trial court erred when it granted the Cities' motions for summary judgment.

We reverse and remand for further proceedings.

WE CONCUR:

---

[13] At the summary judgment hearing, the trial court noted this expert research is evidence, and it is not necessary to have the drivers testify why they may have taken elusive actions "because there is research on that."